FILED
United States Court of Appeals
Tenth Circuit

March 8, 2023

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

LINDA WILLIAMS,

    Plaintiff - Appellant,

v.

AEROFLEX WICHITA, INC.; LORI CROMWELL,

    Defendants - Appellees.

No. 20-3230
(D.C. No. 6:18-CV-01252-EFM)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, Chief Judge, and **EBEL** and **EID**, Circuit Judges.
_____

    Linda Williams sued her employer, Aeroflex Wichita, Inc., and her former supervisor, Lori Cromwell, under Title VII for hostile work environment, racial discrimination, and retaliation. She also brought a claim for intentional infliction of emotional distress against Cromwell. The district court granted judgment on the pleadings on the intentional infliction of emotional distress claim in favor of Cromwell and summary judgment on the Title VII claims in favor of Aeroflex and Cromwell. Williams appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.

Linda Williams began working for Aeroflex in the customer service department in 1999. Customer service is generally an entry-level position, and most Aeroflex employees only stayed in the department for a few years. By the time she filed this suit, Williams had worked there for over twenty years.

Lori Cromwell became Williams' supervisor in September 2000. Their relationship was contentious from almost the very beginning. In her complaint,[1] Williams, who is African American, alleged a long list of poor treatment she suffered at Cromwell's hands. She alleged Cromwell made derogatory comments about her hair and appearance, publicly belittled her several times a week, harassed her over small errors in her work, enforced a stricter dress code with Williams than other employees, made fun of her in front of other employees, and once whispered in a threatening manner that she was watching Williams. In addition to general harassment, Williams specifically recalled one incident when Cromwell told her the scent of Williams' hair oil made her want to vomit; another when Cromwell asked her how many times she was going to change her wig; a time when Cromwell told Williams she looked like Richard Simmons, which she intended as an insult; and an incident when Cromwell threw papers on the floor and made Williams pick them up.

---

[1] At the motion to dismiss stage we treat all Williams' allegations as true, *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008), and at the summary judgment stage, we view all evidence in a light most favorable to her and make all reasonable inferences in her favor, *Tabura v. Kellogg USA*, 880 F.3d 544, 549 (10th Cir. 2018).

Finally, in late 2016, Cromwell recommended Williams receive a "1" on her performance review, which was lower than other employees. However, Cromwell's superiors overruled her and raised the evaluation to a "2" (in line with the other employees) before adding it to Williams' official file.

This behavior did not go unnoticed by Williams' coworkers. One coworker, Erin Craig, believed Cromwell "was always different with [Williams]," and might have been prejudiced based on "just the way her—the tone of her voice would change." App'x Vol. II at 98. Another coworker, Emily Trimpe, testified she thought Cromwell treated Williams unfairly, and she felt "everybody else got common courtesies that [Williams] didn't get." *Id.* at 14. Trimpe did not think Cromwell was "necessarily motivated by the fact that Linda was nonwhite." *Id.* at 119. Neither Craig nor Trimpe recalled a specific instance where Cromwell treated Williams differently than an employee of a different race, and neither reported this behavior to Human Resources.

Cromwell's behavior was not unique to Williams. One of the only other African American employees Cromwell supervised wrote in her exit letter, "there is a high level of tension created by [Cromwell] in the air which caused me to feel that I had to walk on eggshells to approach her for a simple question, and hope that she didn't get irritated." App'x Vol. III at 33–34. Other employees noted Cromwell had a "direct . . . straight to the point style" and that she "was inconsistent, played favorites, and did not offer much encouragement to employees." App'x Vol. I

3

at 195–96 (internal quotation marks omitted). In addition, Cromwell's department had a high turnover rate.

Williams reported Cromwell's behavior numerous times. In 2003, she made a complaint to the then-director of Human Resources, Marjie Hale. Williams told Hale that it felt like Cromwell was "picking on her," and she hoped Cromwell was not prejudiced but feared she might be. App'x Vol. III at 37, 233. Nine years later, she complained again to Connie Tindal, who succeeded Hale, after being "singled out and put under a magnifying glass" for making mistakes. *Id.* at 144 (capitalization omitted). Tindal reported that Williams implied Cromwell's treatment "may be racially motivated" but did not offer any examples of discriminatory treatment. App'x Vol. I at 188–89. In October 2016, Williams sent an email with the subject line "My Cry for Help" to Tindal and Martin Burgess, the Executive Vice President for Human Resources at Aeroflex's parent company. In the email, Williams told them her relationship with Cromwell was "abusive," she felt "put on the spot, degraded or threatened for the loss of [her] job," and that she had been "harassed, belittled, [and] humiliated on more than one occasion." App'x Vol. II at 180–81. She specifically mentioned an incident when Cromwell had issued Williams a disciplinary warning for violating the break time policy on a day when Cromwell had not been present. Cromwell later withdrew the disciplinary warning.

Aeroflex investigated the accusations in Williams' email, interviewing Williams and other employees under Cromwell's supervision and reviewing other employees' exit interviews. Other employees expressed a belief that Cromwell was

"belittling" and "controlling" to her employees, App'x Vol. VI at 55, but none reported prejudice or that Cromwell singled out Williams for particularly bad treatment. When asked directly whether Cromwell treated Williams differently because of her race, one employee said, she "did not know, maybe." App'x Vol. III at 175. As a result of the investigation, Aeroflex counseled Cromwell on her management style. The company allowed Williams to transfer to a different manager in her department. Aeroflex did not decrease Williams' salary, cut any of her benefits, or give her a worse evaluation than any of her coworkers. Aeroflex also referred Williams to the employee assistance program for her anxiety and stress, which had manifested in weight fluctuations, uncontrollable crying, and hair loss.

Shortly before Williams sent her "Cry for Help" email, Aeroflex put some employees in the customer service department, including Williams, on a pass-fail rate program. The program was designed to catch an employee's errors and help them improve accuracy. Aeroflex had used the pass-fail rate program in the past. As a result of the program, Williams' accuracy improved from seventy-six percent to ninety-four percent.

In late October 2016, while the investigation into her "Cry for Help" email was ongoing, Williams filed complaints with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging violations of state and federal antidiscrimination statutes. She specifically alleged Aeroflex had discriminated against her because of her race and her age from April

through August 2016. The KHRC investigated her allegations and held a mediation. The EEOC issued a right-to-sue letter on June 20, 2018.

Williams then filed this suit against Aeroflex and Cromwell for violations of Title VII under theories of hostile work environment, retaliation, and racial discrimination. She also sued Aeroflex for negligent hiring and retention, negligent training or failure to train, and negligent supervision and sued Cromwell for intentional infliction of emotional distress and negligent infliction of emotional distress under Kansas law.

The district court granted judgment on the pleadings on Williams' negligent hiring and retention, negligent training or failure to train, and negligent supervision claims against Aeroflex and the negligent and intentional infliction of emotional distress claims against Cromwell. It granted summary judgment on all remaining claims in favor of Aeroflex and Cromwell. Williams appeals the dismissal of her Title VII claims against both Aeroflex and Cromwell and her intentional infliction of emotional distress claim against Cromwell.

II.

a.

We begin with Williams' Title VII claims. On appeal, we review a grant of summary judgment de novo and apply the same standard as the district court. *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 882 (10th Cir. 2018). We will uphold the district court's grant of summary judgment if Aeroflex and Cromwell can show there is no genuine issue of material fact and they are entitled to judgment

as a matter of law. *Tabura*, 880 F.3d at 549. We view all evidence in the light most favorable to Williams and resolve all reasonable inferences in her favor. *Id.*

### i.

Williams argues Cromwell created a hostile work environment by engaging in a years-long campaign of humiliation and degradation against Williams because of her race, which Aeroflex tolerated.

Under Title VII, an employer may be liable for creating or permitting a hostile work environment when an employee can show "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1327 (10th Cir. 2004). The plaintiff must prove the treatment stemmed from racial animus, *id.*, and that the employer was responsible because it failed to remedy a hostile work environment of which it knew or should have known, *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1139 (10th Cir. 2008).

To prove racial animus, our court has long accepted evidence of "'facially neutral abusive conduct . . . when that conduct is viewed in the context of other, overtly racially-discriminatory conduct.'" *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012) (internal brackets omitted) (quoting *O'Shea v. Yellow Cab Servs.*, 185 F.3d 1093, 1097 (10th Cir. 1999)). Overtly racially discriminatory conduct can include, for example, ongoing offensive or inappropriate racist comments and racial slurs, *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202,

1233–34 (10th Cir. 2022), or "a steady barrage of opprobrious racial comments," *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994). However, "[g]eneral harassment if not racial . . . is not actionable." *Id.*

Williams' evidence contains numerous instances of neutral abusive conduct, including Cromwell's comment about her hair smell, the paper throwing incident, and Cromwell's general poor treatment. But she fails to show the "steady barrage" of "blatant racial harassment" needed to support her claim for a hostile work environment. *See id.*

Williams argues our decision in *Strickland v. United Parcel Service, Inc.*, 555 F.3d 1224 (10th Cir. 2009), "provides a good example of how neutral conduct can create [] a triable question regarding discriminatory animus" such that she can advance past summary judgment without showing any overt racial animus. Aplt. Br. at 44. In *Strickland*, the female plaintiff alleged she was treated differently than her male colleagues by her male supervisor. 555 F.3d at 1230. Her allegations were backed up by her male and female colleagues, who testified the supervisor treated her differently than everyone else. *Id.* Many mentioned a specific example where the supervisor had put the plaintiff, but not her male colleague, on a performance improvement plan even though the male coworker "trailed [her] in nearly every sales measure." *Id.* Williams analogizes the testimony from Strickland's coworkers to that of Trimpe and Craig. However, unlike in *Strickland*, Trimpe and Craig's testimony was vague and equivocal, and neither could point to any specific instance where Cromwell treated Williams differently than a similarly situated non–African

8

American employee. Craig even testified that, while she "really believed" Cromwell was prejudiced, "I don't have any evidence." App'x Vol. II at 98. Trimpe likewise testified that, while Cromwell did treat Williams differently, "I don't know that it was necessarily motivated by the fact that [Williams] was nonwhite. I don't think that was necessarily what motivated her." *Id.* at 119. This testimony falls short of proving Williams was treated differently because of her race, and Williams therefore fails to make a prima facie case for a hostile work environment under Title VII. We hold the district court did not err in granting summary judgment to Aeroflex and Cromwell on this claim.

ii.

As to her Title VII retaliation claim, Williams argues the increased scrutiny over her work and the fact that Aeroflex put her on the pass-fail rate program are evidence Aeroflex and Cromwell retaliated against her for reporting Cromwell's actions. We apply the *McDonnell Douglas* burden-shifting analysis to Title VII retaliation claims when the plaintiff does not have direct evidence of a retaliatory motive. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). Under this framework, the plaintiff must show (1) "he or she engaged in protected opposition to discrimination"; (2) he or she suffered an employment action that a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the materially adverse employment action. *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007). Then, if the plaintiff establishes a prima facie

9

case, "the employer can rebut it by articulating a legitimate nondiscriminatory reason for the adverse action." *Id.* (internal quotation marks omitted). The employee must then show "the proffered reason actually is a pretext masking discriminatory animus." *Id.*

We "liberally construe the phrase adverse employment action," *Stover*, 382 F.3d at 1071 (cleaned up), and have found an adverse employment action may "extend beyond readily quantifiable losses," *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018), as long as "the action is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172 (10th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). However, "petty slights, minor annoyances, and simple lack of good manners" are not sufficient. *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *MacKenzie*, 414 F.3d at 1279.

Williams argues Cromwell and Aeroflex subjected her to adverse employment actions by scrutinizing and criticizing her more than her coworkers, by putting her on

the pass-fail rate program, and by giving her a lower evaluation. But "in our circuit, a [performance improvement plan], standing alone, is not an adverse employment action" unless "it effects a significant change in the plaintiff's employment status." *Ford*, 45 F.4th at 1226 (internal quotations marks omitted); *see also Payan*, 905 F.3d at 1174 (" . . . placement on an employee improvement plan alone does not qualify as a materially adverse action as defined by *Burlington Northern*."). Further, "Title VII protects individuals not from all retaliation but only from retaliation that produces an injury or harm that itself rises to a level of seriousness." *Johnson*, 594 F.3d at 1216 (internal quotation marks omitted) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007)). Williams was not fired, demoted, denied benefits, reassigned to an inferior position, or denied a promotion. She was not the only employee put on the pass-fail rate program, and, as a result of the program, her accuracy improved almost twenty percent. While Cromwell did attempt to give Williams a lower evaluation than other employees, the company raised the evaluation before it went in Williams' official file.

Without more, this increased scrutiny and the pass-fail rate program would not "cause a reasonable employee to for[]go exercising [her] rights under Title VII," *Payan*, 905 F.3d at 1173, and therefore do not rise to the level of an adverse employment action required to sustain a Title VII retaliation claim. We therefore hold the district court did not err in granting summary judgment to Aeroflex and Cromwell on this claim.

**iii.**

Williams next argues the district court erred in granting summary judgment to Cromwell and Aeroflex on her Title VII racial discrimination claim after finding Aeroflex did not subject her to an adverse employment action.

We apply the same *McDonnell Douglas* burden-shifting framework to Title VII discrimination claims. *Fassbender*, 890 F.3d at 883. To make a prima facie case for discrimination, the plaintiff "must establish that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she qualified for the position at issue, and (4) she was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

The adversity standard for a Title VII discrimination claim is more stringent than for a retaliation claim. *See Piercy*, 480 F.3d at 1203 n.12. For the purposes of a discrimination claim, the employer's actions must have "affect[ed] employment or alter[ed] the conditions of the workplace." *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 63). Because, as discussed above, Williams has not shown she suffered an adverse employment action under the more lenient retaliation standard, she cannot establish a prima facie case for Title VII racial discrimination, and we need not examine the other elements of the claim. We therefore affirm the district court's grant of summary judgment to Aeroflex and Cromwell on this claim.

**b.**

Finally, Williams argues the district court erred in granting judgment on the pleadings in favor of Cromwell on her intentional infliction of emotional distress

12

claim by finding Williams did not allege sufficiently extreme and outrageous conduct.

We review dismissals granted under Rule 12(c) de novo. *Corder v. Lewis Palmer School Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009). Under this standard, we do not weigh potential evidence; we only assess whether the plaintiff's claim is legally sufficient to state a claim for which relief may be granted. *Id.* at 1223–24. To state a claim for intentional infliction of emotional distress or outrage under Kansas law, a plaintiff must show (1) the defendant acted intentionally or with reckless disregard for the plaintiff; (2) the defendant's conduct was extreme or outrageous; (3) the plaintiff suffered extreme and severe mental distress; and (4) there is a causal connection between the defendant's conduct and the plaintiff's mental distress. *Bolden*, 43 F.3d at 553. "Kansas courts have been reluctant to extend the outrage cause of action to [workplace] discrimination and harassment claims," and we have extended it in only a few cases. *Id.* at 554. Intentional infliction of emotional distress is for conduct that is "extreme and utterly intolerable," not for hurt feelings or workplace unhappiness, even if the conduct is inappropriate and unnerving. *Id.* at 554–55. Conduct must be "outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Taiwo v. Vu*, 822 P.2d 1024, 1029 (Kan. 1991).

Williams contends Cromwell's "discriminatory and racist conduct . . . coupled with its consistency and length of time [constitutes] severe and outrageous conduct." Aplt. Br. at 60. But in *Bolden*, we held explicitly racist name-calling, "inappropriate

13

and unnerving" slurs and jokes, poor performance reviews, and suboptimal work assignments over a period of five years were "not so extreme and outrageous as to permit recovery" under Kansas law. 43 F.3d at 549–50, 554–55. *Laughinghouse v. Risser*, 754 F. Supp. 836 (D. Kan. 1990), a workplace harassment case to which Williams compares her case, is distinguishable. In *Laughinghouse*, the court declined to grant summary judgment where the defendant-employer harassed and abused an employee by (1) screaming and cursing at her; (2) touching and directing sexual comments towards her without permission; (3) throwing things at her and tearing up files in fits of rage; (4) threatening her with loss of employment; and (5) inhibiting her job performance through several tactics after the employee declined to sleep with him. 754 F. Supp. at 843. The conduct Williams alleges in her complaint—including the derogatory comments, the one time Cromwell threw papers on the floor and made Williams pick them up, and the time Cromwell whispered she was watching Williams—does not reach this level. She does not allege unwanted touching, repeated screaming, cursing, yelling, or threats of loss of employment. *Compare id.* (describing conduct that was so outrageous as to be actionable). While undoubtedly unpleasant, Cromwell's actions do not meet the "extreme and outrageous" conduct Kansas courts require.

    We therefore hold the district court did not err in granting judgment on the pleadings to Cromwell on Williams' intentional infliction of emotional distress claim.

## III.

For the reasons above, we AFFIRM the district court's grant of summary judgment to Aeroflex and Cromwell on Williams' Title VII claims and grant of judgment on the pleadings to Cromwell on Williams' intentional infliction of emotional distress claim.[2]

                                      Entered for the Court

                                      Allison H. Eid
                                      Circuit Judge

---

[2] Appellant's motion to seal Volumes V and VI of the appendix is granted. However, the court has cited to and quoted from the portions of those volumes that appear in the parties' publicly filed briefs.